# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| _____ | : | |
| JOHN DOE CORPORATION, | : | |
| | : | Civil Action No.: 4:24-cv-1103 (LHR) |
| *Plaintiff*, | : | |
| | : | |
| v. | : | **FIRST AMENDED COMPLAINT FOR** |
| | : | **INJUNCTIVE AND DECLARATORY** |
| PUBLIC COMPANY ACCOUNTING | : | **RELIEF** |
| OVERSIGHT BOARD, | : | |
| | : | |
| *Defendant*. | : | |
| _____ | : | |

Plaintiff John Doe Corporation[1] seeks declaratory and injunctive relief to stop defendant Public Company Accounting Oversight Board (the "Board") from enforcing an excessively intrusive and burdensome investigative "Accounting Board Demand" ("ABD") ostensibly authorized by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"). As explained herein, the Board's ABD—the sixth in a succession of similar demands issued by the Board's non-governmental staff employees ("Staff")[2] over the course of a prolonged non-public investigation— is not just abusive, retaliatory, and excessively burdensome; it is the most recent salvo in a secretive, unaccountable Board investigative process that (i) is the product of an unlawful

---

[1] "John Doe Corporation" is a pseudonym used to protect Plaintiff's true identity. In connection with Plaintiff's motion for leave to allow Plaintiff to prosecute this lawsuit pseudonymously filed contemporaneously with the original Complaint, the Court determined that "[g]iven the unique position of the suit, the court will allow John Doe Corporation to litigate under a pseudonym until the defendant enters an appearance, either answers or moves to dismiss the complaint, and can take a position on John Doe Corporation's desire to proceed pseudonymously. The court will then hold a hearing on whether to allow John Doe Corporation to continue to proceed under a pseudonym with a fuller record supporting the decision." (Dkt. 007). The parties agreed, as memorialized in a Joint Case Management Stipulation filed with this Court on May 24, 2024 (Dkt. 006), on a briefing schedule on Plaintiff's Motion for Leave to Litigate This Case Pseudonymously, or a statement by Defendant that Defendant does not oppose such motion, following decision by the Court on Defendant's Motion to Dismiss under Fed. R. Civ. P. 12.

[2] All references to "Staff" contemplate the Board's non-governmental staff employees, regardless of the Board's Division to which such Staff are or were assigned.

delegation of legislative, executive, and quasi-judicial power to the Board; (ii) is the product of an unlawful delegation of executive and quasi-judicial power to non-governmental employees; (iii) is structurally unconstitutional; and (iv) deprives Plaintiff of the due process of law mandated by the Fifth Amendment and the "fair procedures" mandated by Sarbanes-Oxley. For clarity, this lawsuit does not relate to an already-instituted adversarial non-public administrative proceeding by the Board's Staff, despite the Board's conduct of unsupervised investigations in an adversarial and non-objective fact-finding manner. Instead, this case relates expressly and solely to the Board's non-public investigative process conducted entirely by the Staff of the Board's Division of Enforcement and Investigations ("DEI"), none of whom is a government employee yet wields against Plaintiff punitive executive law enforcement power under color of federal law without meaningful direction and supervision by any principal officer of the executive branch in violation of Article II of the Constitution.

Through its most recent ABD, the Board yet again purports to command Plaintiff to turn over reams of private documents or suffer fines, debarment, additional punishment, and potentially even referral for criminal prosecution for purported "noncooperation."  Absent the declaratory and injunctive relief sought herein, Plaintiff will have no opportunity to obtain pre-enforcement judicial review of the ABD and will be left with the Hobson's choice of either obeying the Board's unconstitutional demand or "betting the farm" on potential future judicial review that would occur, if ever, long after the Board has effectively put Plaintiff out of business.

The Court should declare the Board's investigative demand unconstitutional and enjoin its enforcement.

## JURISDICTION AND VENUE

1.     The Court has jurisdiction under Article III, section 2 of the United States Constitution and 28 U.S.C. §§ 1331, 1367, and 1651. *See also Free Enter. Fund v. Pub. Co. Acct'g Oversight Bd.*, 561 U.S. 477, 489-91 (2010) ("*Free Enterprise Fund*"); *Axon Enter., Inc. v. Fed. Trade Comm'n*, 143 S. Ct. 890, 897 (2023).

2.     Jurisdiction is further proper in this District because of the Board's extensive contacts with and directly in this District.

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff is headquartered in this District, a substantial part of the events or omissions giving rise to the claims herein occurred in this District and the Board is subject to the court's personal jurisdiction with respect to the claims asserted herein. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(e) because the Board is an arm, agency or instrumentality of the United States, Plaintiff resides in this District, and no real property is involved in this action.

## PARTIES

4.     Plaintiff John Doe Corporation is registered with the Board as a "registered public accounting firm" within the meaning of Sarbanes-Oxley § 2(a)(12), 15 U.S.C. § 7201(a)(12). At all times relevant hereto, John Doe Corporation was -- and still is -- incorporated in Texas, headquartered in the Southern District of Texas, and licensed to perform accounting services by the State of Texas. Moreover, John Doe Corporation maintains and retains all audit and other attest engagement files in the Southern District of Texas. All Certified Public Accountants ("CPAs") who are Partners in and employees of John Doe Corporation are licensed as CPAs by the State of Texas. John Doe Corporation's registration with the Board reflects that the firm is domiciled and at all times has been domiciled in the Southern District of Texas.

5.      Defendant Board is established and organized as a private, nonprofit corporation created by Sarbanes-Oxley § 101, 15 U.S.C. § 7211, and organized under the laws of the District of Columbia. The Board is headquartered in the District of Columbia and, at all times relevant to the Complaint, had at least a dozen other offices across the United States, including at least two in Texas, one of which was in the Southern District of Texas, in Houston. The Board has more than 800 employees and claims regulatory jurisdiction over more than 1,500 registered public accounting firms worldwide, including 58 in Texas, along with innumerable individuals employed by and associated with those firms and others that are headquartered elsewhere but have offices in Texas. Of the 58 registered firms in Texas, it appears as if 27 are based in the Southern District of Texas, including 26 in the greater Houston area. That number equates to 46% of PCAOB-registered public accounting firms in Texas being located in the Southern District of Texas.

6.       The accounting firms registered with the Board and located in the Southern District of Texas, as is true for all registered firms, are required to comply with the Board's Rules, Auditing Standards, and document demands under threat of enforcement sanctions and possible criminal prosecution.

7.      Among the functions that the Board's Staff performs is conducting periodic inspections of registered public accounting firms. The inspectors who perform the inspections are part of the Board's Division of Registration and Inspections ("DRI"). The Board's DRI Staff inspection team leader for the inspection that led to the investigation at issue in this lawsuit was assigned to the Board's Houston, Texas office.

8.      Prior to the Covid pandemic, Board DRI Staff conducting inspections of Plaintiff conducted all of those inspections onsite at Plaintiff's headquarters office in the Southern District of Texas.  Moreover, to the extent certain of the DRI Staff who participated in the inspections were

not assigned to the Houston, Texas office of the Board, those DRI Staff traveled to the Southern District of Texas to work on the inspection for the Board. Those DRI Staff reviewed audit workpapers and interviewed Plaintiff's partners and staff in-person in the Southern District of Texas.

9.     During the Covid pandemic, the DRI Staff who conducted inspections of Plaintiff conducted all such inspections remotely via videoconference platform, and Plaintiff's partners and staff who participated in the inspections were located at the Plaintiff's headquarters office in the Southern District of Texas.

10.    All documents, including audit workpapers, that Plaintiff and its partners and employees produced pursuant to requests and demands issued to them in connection with inspections were documents, including business records, that were created in, maintained in, and produced from within the Southern District of Texas, and were obtained by DRI Staff pursuant to requests and demands purposefully sent by DRI Staff into this District.

11.    The Board's DRI Staff conducting the next already-planned inspection of Plaintiff has scheduled the inspection to occur at least in part in-person at Plaintiff's headquarters office in the Southern District of Texas.

12.    All communications, including e-mails, telephone calls, and videoconferences, by the Board's Staff directly to Plaintiff at all times have been to Plaintiff's headquarters office in the Southern District of Texas.

13.    Plaintiff conducted the audit(s) that is (are) the subject of the investigation from and within the Southern District of Texas.

14.    To the extent that Plaintiff's audit engagement team members conduct audits and perform other attest engagements on the premises of clients, those audit engagement team

members travel from the Southern District of Texas and return thereafter to the Southern District of Texas.

15. Plaintiff issued all audit opinions from the Southern District of Texas for the issuer, the audits of which are the subject of the Board investigation and the ABD challenged herein, and Plaintiff, through an audit partner of the firm, signed all audit opinions in the Southern District of Texas.

16. All documents, including audit workpapers, that John Doe Corporation and its partners and employees, pursuant to voluntary requests and compulsory demands issued to them by ABDs, produced to DEI Staff were documents, including business records, that were created in, maintained in, and produced from within the Southern District of Texas, and were obtained by DEI Staff pursuant to requests and demands purposefully sent by DEI Staff into this District.

17. John Doe Corporation never has been licensed to perform accounting services in the District of Columbia and never has conducted an audit of an issuer headquartered in the District of Columbia.

18. Board Rule 5303 provides, in pertinent part, that "… all civil money penalties shall be used to fund a merit scholarship program for undergraduate and graduate students enrolled in accredited accounting degree programs, administered by the Board or by an entity or agent identified by the Board." *Section 5: Investigations and Adjudications*, PCAOB, https://pcaobus.org/about/rules-rulemaking/rules/section_5 (last visited July 1, 2024). For each of the nine academic school years for the period 2015 through 2024, the Board awarded merit-based scholarships to students at universities in the Southern District of Texas. These scholarship awards, by academic year and university, were 2015-2016 to one Texas college student attending the University of Houston; 2016-2017 to two students attending the University of Houston; 2017-2018

to a non-specified number of students attending the University of Houston; 2018-2019 to a non-specified number of college students attending Prairie View A&M University, Texas A&M University – Corpus Christi campus, Texas Southern University, University of Texas – Rio Grande Valley campus, and the University of Houston; 2019-2020 to five students attending Texas A&M University – Corpus Christi campus, University of Texas – Rio Grande Valley campus, and the University of Houston; 2020-2021 to seven students attending Texas A&M University – Corpus Christi campus, University of Texas – Rio Grande Valley campus, and the University of Houston; 2021-2022 to seven students attending the University of Houston, University of Texas – Rio Grande Valley campus, and Texas A&M University – Corpus Christi campus; 2022-2023 to a non-specified number of students attending the University of Houston, University of Texas – Rio Grande Valley campus, and Texas A&M University – Corpus Christi campus; and 2023-2024 to nine students attending the University of Houston, University of Texas – Rio Grande Valley campus, Texas A&M University – Corpus Christi campus, and Texas Southern University.

## FACTS

A.   **"This Unprecedented Extra-Constitutional Stew" and "Extra-Constitutional" Existence[3]**

19.     The Board is not a federal agency, although it is treated as such for constitutional purposes. Sarbanes-Oxley created the Board as a private, nonprofit, non-governmental corporation under the laws of the District of Columbia:

> The Board shall not be an agency or establishment of the United States Government, and, except as otherwise provided in this Act, shall be subject to, and have all the powers conferred upon a nonprofit corporation by, the District of Columbia Nonprofit Corporation Act.  No member or person employed by, or agent for, the Board shall be deemed to be an officer or employee of or agent for the Federal Government by reason of such service.

---

[3] *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 713 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *rev'd* 561 U.S. 477 (2010).

15 U.S.C. § 7211(b).  As the Supreme Court noted in *Free Enterprise Fund*, this allows the Board to "recruit its members and employees from the private sector by paying salaries far above the standard Government pay scale."  561 U.S. at 485.

20.     The Board is led by five members whom the Securities and Exchange Commission ("SEC"), acting collectively as a "Head of Department" within the meaning of the Appointments Clause of the Constitution, appoints as "inferior" constitutional officers. 15 U.S.C. § 7211; *see generally Free Enter. Fund*, 561 U.S. at 484-87.

21.     Notwithstanding its legal status as a private corporation, the Board "is a Government-created, Government-appointed entity, with expansive powers to govern an entire industry." *Id.* at 484-85.

> Every accounting firm—both foreign and domestic—that participates in auditing public companies under the securities laws must register with the Board, pay it an annual fee, and comply with its rules and oversight. The Board is charged with enforcing the Sarbanes-Oxley Act, the securities laws, the Commission's rules, its own rules, and professional accounting standards. To this end, the Board may regulate every detail of an accounting firm's practice, including hiring and professional development, promotion, supervision of audit work, the acceptance of new business and the continuation of old, internal inspection procedures, professional ethics rules, and "such other requirements as the Board may prescribe."

*Id*. at 485 (internal citations omitted).

22.     The Board's investigative, prosecutorial, and pseudo-judicial adjudicative powers are massive and largely unchecked. Although the Board may claim to be accountable to the SEC, the Board in fact operates as a rogue and secretive entity with a track record of suffocating and punishing small and mid-sized auditing firms. In fact, upon information and belief, on the rare occasions on which the SEC's Division of Enforcement requests that DEI Staff share information from investigations, DEI Staff makes it extremely difficult for its purported overseeing federal agency to receive the requested information. After years of investigation, the Board can impose

severe punitive sanctions against individual accountants and accounting firms within its regulatory reach, up to the permanent revocation of a firm's registration, a permanent ban on an individual associating with any Board-registered accounting firm, and civil monetary penalties of up to $1.1 million per violation for natural persons and $22 million per violation for firms. 15 U.S.C. § 7215(c)(4); 17 C.F.R. § 201.1001. These felony-sized penalty amounts are *five times higher* for natural persons and *20 times higher* for firms than the maximum penalties SEC itself can impose. *See, e.g.*, 15 U.S.C. § 78u-2(b); 17 C.F.R. § 201.1001.

23.     Employment bans, termed "bars from association," imposed by the Board on individual accountants can be extremely broad and onerous—and frequently career-ending.  For example, the Board can bar individual accountants from being "associated with" registered public accounting firms in even a non-accounting capacity; bar them from associating with any issuer, broker, or dealer in any financial capacity; and even require them to obtain prior Board or SEC approval before taking any job whatsoever (professional or otherwise) with any issuer, broker, or dealer. 15 U.S.C. § 7215(c)(7)(B). Although a barred auditor may apply to the Board for reinstatement and the ability to resume association with a registered firm, it is widely known that a time-limited bar is illusory, as any "bar from association" functionally operates as a lifetime bar. Moreover, it is widely known that the Board, as currently constituted, rarely permits a barred auditor to re-associate with a registered firm. Thus, the imposition of even a time-limited bar or suspension frequently operates as a lifetime deprivation of an auditor's ability to ever again audit financial statements of public companies.  And only the fortunate few are able to sell their practices in a fire sale to meet the start-date of the bar or suspension.

24.     As nominally private actors, the Board and its staff function beyond the purview of many of the basic checks, balances, and transparency requirements designed to protect individuals

from overzealous governmental coercion and punishment. For example, upon information and belief, the Board and its staff are not constrained by the Administrative Procedure Act, the Sunshine Act, the Freedom of Information Act, the Advisory Committee Act, the Equal Access to Justice Act, the Paperwork Reduction Act, and countless other laws applicable to nearly all other regulators.  Ironically, these constraints do apply directly to the SEC, which has limited oversight responsibility for the Board, but not to the Board itself.  Upon information and belief, Board staff members (other than perhaps hearing officers), unlike their governmental counterparts, are not even required to take an oath to "support and defend the Constitution" and to "bear true faith and allegiance to the same."  5 U.S.C. § 3331.

25.     While the Board itself is and acts as a government agency, Board Staff are not government employees. On information and belief, Board Staff carry out Board functions with minimal, if any, oversight from either the Board itself or the SEC, and Board Staff carry out Board functions through solely discretionary acts. Moreover, on information and belief, Board Staff is compensated differently from, in fact over and above, typical government employees, and Board Staff do not work a schedule typical of other government employees.[4] In other words, Board Staff are employed and act at all times as private citizens, with minimal oversight.

26.     Congress has increasingly relied on various similar models of outsourcing vast governmental powers to private actors who are neither elected by the citizenry nor appointed by the President with the Senate's advice and consent.  The trend has elicited understandable scorn from several current Supreme Court justices in cases involving other nominally private regulators:

> One way the Government can regulate without accountability is by passing off a Government operation as an independent private concern.  Given this incentive to regulate without saying so, everyone should pay close attention when Congress

---

[4] For example, similar to registered public accounting firms that register with the Board, the Board closes altogether for the winter holidays from approximately December 24 through January 2.

"sponsor[s] corporations that it specifically designate[s] not to be agencies or establishments of the United States Government."

. . . .

When it comes to private entities . . . there is not even a fig leaf of constitutional justification.  Private entities are not vested with "legislative Powers."  Art. I, § 1.  Nor are they vested with the "executive Power," Art. II, § 1, cl. 1, which belongs to the President . . . .  By any measure, handing off regulatory power to a private entity is "legislative delegation in its most obnoxious form."

*Dept. of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 57, 62 (2015) (Alito, J., concurring) (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 390 (1995) and *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)).  *Accord Texas v. Comm'r of Internal Revenue*, 596 U.S. __, 142 S. Ct. 1308, 1308 (2022) (Alito, J., joined by Thomas, J. and Gorsuch, J.) ("To ensure the Government remains accountable to the public, it cannot delegate regulatory authority to a private entity" (internal citations omitted)).

27.     The Board is subject to at least *some* constitutional limitations, such as the requirement that its leadership be constitutionally appointed and accountable to the President.  *See Free Enter. Fund*, 561 U.S. at 492.  After all, the Board exercises vast powers that are "typically carried out" by governmental officials.  *Id*. at 504-05.  As one scholar explains, Congress initially considered creating the Board as a division or office within the SEC, a government agency; instead, Congress deliberately rejected that model because it wished to create a "strong, independent" private regulator that would wield "massive power, unchecked power, by design."  *See* Donna M. Nagy, *Is the PCAOB a "Heavily Controlled Component" of the SEC?: An Essential Question in the Constitutional Controversy*, 71 U. Pitt. L. Rev. 361, 375-85 (2010) (quoting statement of Sen. Gramm).  It is no surprise, therefore, that current Supreme Court justices have variously described the Board as "highly unusual," *Free Enter. Fund*, 561 U.S. at 505, "uniquely structured," *Free*

*Enter. Fund v. PCAOB*, 537 F.3d 667, 668 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), and an "unprecedented extra-constitutional stew," *id.* at 713.

**B.     The Board's Unsupervised Exercise of Executive and Pseudo-Judicial Powers**

28.     One of the few theoretical checks on the Board's autonomy and massive power is the direction, oversight, and supervision purportedly exercised by the presidentially appointed, Senate-confirmed SEC Commissioners who are "principal" constitutional officers under the Appointments Clause of the Constitution.  When the Board flexes its delegated *legislative* muscle through rulemaking, for example, SEC Commissioners play a critical preemptive gatekeeper function:  Before any Board rule can become effective and bind anyone, the SEC Commissioners first must approve the rule through the public rulemaking process.  15 U.S.C. § 7217(b).

29.     But SEC Commissioners play no similar gatekeeper role when the Board flexes its enormous *executive* and *pseudo-judicial* powers—*i.e.*, the investigative and looming disciplinary and adjudicative powers challenged in this case.  To the contrary, the Board wields those executive and pseudo-judicial powers autonomously and unilaterally, with *zero* real-time direction, oversight, supervision, or framework for prompt review by the presidentially-appointed SEC Commissioners.

30.     For example, upon information and belief, SEC Commissioners—the only "principal" constitutional officers anywhere in sight—play no role in deciding whom the Board will investigate; what should be investigated; what documentary evidence and testimony should be demanded; from whom documents and testimony should be demanded; how voluminous and burdensome those demands should be; whether to accomplish the request through voluntary means or by the threat-centered compulsory ABD process at issue here; whether formal disciplinary charges should be filed; if so, who should be charged and what charges should be alleged; what

evidence should be admitted and considered; how to weigh that evidence; whether to accept a negotiated settlement; and what sanctions, if any, should be imposed in any settlement.

31.     All those executive and pseudo-judicial powers are left to the largely unfettered discretion of the Board—or more precisely, as explained below, pushed down to the unfettered discretion of wholly unaccountable private citizens employed by the Board.  Upon information and belief, the Board has never rejected a recommendation by the Board's Division of Enforcement and Investigations ("DEI") to initiate a formal investigation or to institute a formal disciplinary (enforcement) action.  Moreover, as explained below, the Board has adopted no formal rules or procedures through which recipients of ABDs and other DEI staff investigative demands can seek the Board's intervention to retract or limit the scope and burden of any unreasonable demands.

32.     Upon information and belief, the Board has not established formal written procedures for sharing information with the SEC's Division of Enforcement, which would be central to the ability of the SEC to supervise the Board's activities through its Staff.

33.     Upon information and belief, the only time SEC Commissioners play any meaningful role in a typical Board investigation or disciplinary proceeding is in the exceptionally rare case where the "target" of a Board investigation:  (1) is charged formally with wrongdoing after investigation by DEI staff; (2) neither agrees to settle charges nor defaults; (3) is sanctioned after a full disciplinary proceeding, including an evidentiary hearing on the merits before a Board hearing officer; (4) appeals the hearing officer's decision to the Board members; (5) loses the appeal at the Board level; *and only then* (6) subsequently appeals the adverse result to the SEC Commissioners (or SEC reviews the sanctions on its own initiative—a theoretical possibility under the relevant statute but one that, to Plaintiff's knowledge, never has in fact happened).  This full gauntlet typically takes many years and is extraordinarily punitive given the financial expense and

stress for the exceptionally rare Board targets who endure the entire process.  Moreover, DEI staff, as agents of the Board, take advantage of this imbalance, in particular against smaller and mid-sized audit firms and the persons associated with them, making it effectively impossible for a target to defend itself through the laborious, time-consuming, and cost-prohibitive process.

34.     For these reasons among others, most Board investigative targets settle rather than defend themselves.  Over the Board's entire 22-year history, only *eight* of the Board's several hundred disciplinary cases—about two percent—have ever been appealed to the SEC Commissioners.  (A ninth appeal was filed on January 30, 2024, but it will likely be several months—and perhaps a year more—before the SEC Commissioners decide that case.)  The last time the SEC Commissioners decided such an appeal was nearly five years ago in May 2019.  And only two of the eight Board cases ever reviewed by the SEC—that is, less than one half of one percent of all Board enforcement cases thus far made public—have ever been reviewed subsequently by any federal court of appeals.[5]  In its hundreds of other enforcement cases, the Board has investigated, charged, and penalized its targets with no meaningful direction, oversight, supervision, or after-the-fact review by even the SEC Commissioners, much less by any Article III Judge. And, that punishment includes muzzling the charged firm's or associated persons' First Amendment right of free speech by prohibiting, under penalty of further sanction, either the ability to explain the true reasons for agreeing to a settled disposition or criticizing the Staff's conduct of the investigation.

35.     This absence of SEC direction and supervision is especially problematic because even the five SEC-appointed Board members—the Board's only validly appointed constitutional

---

[5] In one of the two cases to reach federal court, the court ultimately set aside the Board's sanctions and the charges were dismissed, but that result came more than *nine years* after the Board initiated the case.  *Laccetti v. SEC*, 885 F.3d 724 (D.C. Cir. 2018).  In the other, the court upheld the Board's sanctions in an unpublished order issued more than six years after the Board initiated the case.  *Kabani & Co. v. SEC*, 733 F. App'x 918 (9th Cir. 2018).

officers—play only a limited, episodic role in typical Board investigative or disciplinary proceedings. Upon information and belief, those proceedings are conducted and supervised almost entirely by the Board's private staff employees within DEI—the Staff, none of whom is constitutionally appointed even as an inferior officer. Upon information and belief, these non-governmental employees make countless significant, discretionary, legally binding decisions over the years-long course of typical Board investigations and disciplinary proceedings, without any day-to-day direction or supervision by even the SEC-appointed Board members, much less by the SEC's Commissioners.  Also upon information and belief, rather than respect an investigative target's assertion of rights in response to investigative demands, DEI staff routinely react by threatening "noncooperation" either as a stand-alone or companion charge.[6]  To use a criminal law analogy, that reaction is akin to treating the assertion of rights by a criminal investigative target as obstruction of justice. Indeed, the Board's unchecked exercise of executive and pseudo-judicial powers renders the Board the type of carte blanche interpretive and adjudicatory authority that was recently condemned by the United States Supreme Court. *See Loper Bright Enterprises v. Raimondo* and *Relentless, Inc. v. Dep't of Commerce*, 144 S.Ct. 2244, 2267 (2024) ("[D]elegating ultimate interpretive authority to agencies is simply not necessary to ensure that the resolution of statutory ambiguities is well informed by subject matter expertise. The better presumption is therefore that Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch. And to the extent that Congress and the Executive

---

[6] In fact, DEI Staff portend DEI's free-wheeling unrestrained use of the threat of charging noncooperation by including in its form that accompanies ABDs and is presented to witnesses as an exhibit in ABD-compelled investigative testimony the language "[c]onduct constituting noncooperation includes (1) failing to comply with an Accounting Board Demand … (3) abusing the Board's processes for the purpose of obstructing an investigation, or (4) otherwise failing to cooperate in connection with an investigation (*See* PCAOB Rule 5110(a))."

Branch may disagree with how the courts have performed that job in a particular case, they are of course always free to act by revising the statute.")

36.     Upon information and belief, the SEC-appointed Board members are involved meaningfully at only three discrete points in a typical Board investigation and disciplinary proceeding: (1) they typically review and approve DEI staff's decision to commence a formal investigation, which then unleashes DEI staff's unfettered discretion to issue an unlimited number of investigative demands of any breadth and burden without further approval from Board members—and to threaten recipients with severe punishment for "noncooperation" if the recipients object to those demands or fail to comply; (2) after the staff's investigation is completed, they typically review and approve DEI staff's decision to file formal charges (and in most cases they approve one or more contemporaneous settlement agreements already negotiated and finalized by DEI staff); and (3) after a hearing officer has conducted any necessary hearings and issued a decision, they decide any appeals from that decision. With respect to appeals from hearing officer decisions, upon information and belief, the Board often overturns hearing officer decisions favorable to a charged firm or individual, but rarely (if ever) overturns hearing officer decisions favorable to DEI.  At all other times throughout the years-long process, upon information and belief, Board members are largely oblivious to what private DEI staff are doing in any given investigation or disciplinary proceeding.

37.     Yet the coercive and discretionary power wielded by these private Board employees is extraordinary.  For example, when conducting investigations, DEI Staff routinely issue multiple intrusive and burdensome ABDs that can force recipients to search for and produce troves of private documents and other information, and to submit to multiple days of interrogation under oath, all backed by the threat of punishment for "noncooperation"—which can include loss of

livelihood, substantial monetary penalties, and even incarceration—if recipients fail to obey DEI Staff's commands.  The cost and burden of complying with these demands can be staggering.  And the Board allows no process by which recipients of these intrusive and coercive DEI Staff demands can seek even the Board members' intervention (much less that of the SEC Commissioners or a court) to challenge the appropriateness or breadth of the demands.  Unsurprisingly, most Board targets cannot afford to risk their livelihoods and life savings—not to mention the wrath of their principal regulator and potential incarceration—so they predictably choose to obey DEI Staff's demands, thereby forgoing any meaningful opportunity to challenge those demands as unconstitutional or otherwise improper.

38.    Board disciplinary proceedings that follow DEI Staff investigations are no less coercive and no less expensive to defend.  The Board's procedural rules and hearing officer orders require respondents to comply with numerous commands and deadlines, again upon threat of punishment for noncooperation or being found in default.  At the end of a process that typically involves voluminous briefing and live testimony at a hearing, the hearing officer is empowered to punish the accused with fines, industry suspensions or bars, and other potential sanctions, which become final and enforceable unless appealed to the Board members.

39.    To reiterate, *all* of this core executive and pseudo-judicial activity is performed and superintended by *private* citizens, none of whom is constitutionally appointed as even an "inferior" officer of the United States.  Upon information and belief, the activity is subject to only limited, sporadic direction and supervision by the Board members, while the SEC's Commissioners—the only principal constitutional officers in the vicinity with statutorily mandated oversight responsibility—are entirely uninvolved and oblivious to the facts and proceedings as this vast and

coercive power is wielded against regulated accountants and accounting firms over the course of a multi-year process.

40.     The target of an investigation and disciplinary enforcement action by the Board's private-sector employees theoretically has the right to appeal any sanction imposed by the hearing officer to the SEC-appointed Board members (and then to the SEC Commissioners and, finally, to a federal appeals court, as previously noted), but for most targets that remote prospect of eventual appellate review is not only cost-prohibitive but also ephemeral.  Of the several hundred targets investigated and prosecuted by Board staff members over the Board's 22-year history, very few have had the resources and perseverance to appeal their sanctions even to the Board members, much less to the SEC or a federal court.  As best Plaintiff can tell from the available public record, targets in only 12 Board enforcement cases have ever appealed their sanctions even to the Board members, and the last time Board members decided such an appeal on the merits appears to have been more than six years ago (in December 2017).

**C.     The Unavailability of a Venue, Process, or Mechanism to Challenge Board Staff-Issued ABDs**

41.     Sarbanes-Oxley authorizes the Board to investigate suspected violations of the Act, Board Rules, the securities laws applicable to preparing and issuing audit reports, the obligations and liabilities of accountants concerning them (including SEC rules issued under Sarbanes-Oxley), and professional auditing standards. Sarbanes-Oxley § 105(b)(1), 15 U.S.C. § 7215(b)(1).

42.     Sarbanes-Oxley further empowers the Board to: (a) compel testimony from a firm or its associated persons about any matter that the Board considers relevant to the investigation; (b) require a firm or its associated persons to produce audit work papers and other documents or information in their possession that the Board considers relevant to the investigation, and inspect the books and records of the firm or its associated persons to verify the accuracy of the documents

or information supplied; (c) with appropriate notice, request testimony and document production from third parties, including a firm's audit clients, concerning any matter that the Board considers relevant to the investigation; and (d) establish procedures for seeking subpoenas from the SEC for testimony or documents. Sarbanes-Oxley § 105(b)(2), 15 U.S.C. § 7215(b)(2).

43.     The Board also may punish firms and their associated persons for refusing to cooperate with investigations. Potential sanctions include public censures, draconian fines, industry bars or suspensions, and "other lesser sanctions." Any such sanctions can be appealed in the first instance only to the SEC, but only after the sanctions become "final" with the Board. Sarbanes-Oxley §§ 105(b)(3), 107(c)(2), 15 U.S.C. §§ 7215(b)(3), 7217(c)(2); 17 CFR § 201.440(a).

44.     Sarbanes-Oxley also directed the Board to promulgate rules to provide "fair procedures" for investigating and disciplining registered public accounting firms and their associated persons. Sarbanes-Oxley § 105(a), 15 U.S.C. § 7215(a). But the statute did not define "fair procedures" and provided no intelligible principle to guide or constrain the Board in promulgating such rules. As a predictable result, the Board's investigative and disciplinary process is notoriously one-sided, lacking in transparency, and abusive—and anything but fair.

45.     As relevant here, for example, neither Sarbanes-Oxley nor Board Rules impose any limit on the number of years DEI Staff can investigate a targeted firm or individual. Unlike federal rules governing civil litigation, Board Rules also do not limit the number of ABDs and other investigative demands DEI Staff may issue during an investigation, nor the scope of those demands, nor the cost and burden inflicted upon recipients to comply with those demands. There are likewise no limits on the number of hours the recipient of an ABD may be interrogated under oath by the Board's DEI Staff. Not surprisingly, therefore, the Board's overall investigative and

disciplinary process typically takes many years to complete, features multiple successive ABDs requiring targeted firms and auditors to produce reams of private documents at great burden and expense, and compels witnesses to endure lengthy testimony sessions—often for several days on end.  DEI's investigation of Plaintiff has been no exception.

46.     Particularly troublesome is that neither Sarbanes-Oxley nor Board Rules provide any process, procedure, or mechanism for a party to challenge the validity, scope, or legality of a Board investigation or of any ABD issued by DEI Staff in connection with a Board investigation. This blatant denial of due process of law contrasts sharply with the pre-enforcement judicial relief available in the context of government investigations, particularly those conducted by the SEC.

47.     Under the Securities Exchange Act of 1934 (the "Exchange Act"), the SEC must invoke the jurisdiction of a court of the United States to secure compliance with a subpoena issued in connection with one of its own investigations. 15 U.S.C. § 78u(c). Stated otherwise, "such subpoenas are unenforceable absent a court order." *Sprecher v. Graber*, 716 F.2d 968, 974 (2d Cir. 1983). Then, "[t]o win judicial enforcement of an administrative subpoena, the SEC 'must show [1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the Commissioner's possession, and [4] that the administrative steps required ... have been followed....'" *RNR Enters. v. SEC*, 122 F.3d 93, 96–97 (2d Cir. 1997) (quoting *United States v. Powell*, 379 U.S. 48, 57–58 (1964)).

48.     This crucial constitutional safeguard—the availability of Article III judicial review *before* testimony or production of documents can be compelled—is completely absent in the context of Board Staff-issued ABDs, which thereby become self-executing. Indeed, with DEI Staff-issued ABDs in Board investigations, Board Rules do not even allow recipients to seek prior

review of the ABD by the SEC-appointed Board members or the SEC Commissioners before obedience is compelled, much less by an Article III court. Indeed, "because the matter before [the Board] is one which, from its nature is the subject of a suit at the common law, the responsibility for deciding [it] rests with Article III judges in Article III courts." *SEC v. Jarkesy*, 144 S. Ct. 2117, 2145 (2024) (Gorsuch, J., concurring) (internal quotation marks and citations omitted) (second alteration in original). "And that tells us all we need to know that the [Board's] scheme violates Article III by withdrawing the matter from judicial cognizance and handing it over to the Executive Branch for an in-house trial." *Id.* (internal quotation marks and citations omitted).

49.     ABD recipients have only two options: (1) obey the DEI Staff-issued ABD, and thereby effectively forgo any meaningful opportunity to challenge it; or (2) disobey the ABD and be punished (and possibly even be referred for criminal prosecution) for violating Board Rules that prohibit "noncooperation." As previously discussed, punishment for noncooperation could be challenged eventually through belated judicial review, but any such review comes far too late to provide meaningful relief or to satisfy the constitutional requirement of due process of law and the statutory requirement of fair procedures.

50.     Another crucial due process safeguard is "fair notice," a "basic principle of administrative law." *SNR Wireless License Co., LLC v. FCC*, 868 F.3d 1021, 1043 (D.C. Cir. 2017). As the Fifth Circuit stated in an oft-cited case, "[i]f a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." *Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976). The agency "must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents." *Id.* "In the absence of notice—for example, where the regulation is not sufficiently clear

to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 578 (5th Cir. 2017) (quoting *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995)).

51.     The lack of venue or mechanism to challenge Board-issued ABDs also implicates ABD recipients' rights to a jury trial under the Seventh Amendment, as made clear by the United States Supreme Court's recent decision in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024). There, the Court considered whether the SEC's in-house adjudicatory procedures violate the Seventh Amendment right to a jury trial. *Jarkesy*, 144 S. Ct. at 2125. The Court explained that, in its in-house procedures, the SEC "presides and finds facts while its Division of Enforcement prosecutes the case," and the SEC "may also delegate its role as judge and factfinder to one of its members or to an administrative law judge (ALJ) that it employs." *Id.* (citing 15 U.S.C. § 78d-1). "In these proceedings, the [SEC] or its delegee decides discovery disputes . . . and the SEC rules govern." *Id.* at 2126. The SEC "or its delegee also determines the scope and form of permissible evidence and may admit hearsay and other testimony that would be inadmissible in federal court." *Id.* "Judicial review is . . . available once the proceedings have concluded . . . [b]ut such review is deferential" because "a reviewing court must treat the agency's factual findings as 'conclusive' if sufficiently supported by the record, even when they rest on evidence that could not have been admitted in federal court." (*Id.*) (citations omitted).

52.     The *Jarkesy* Court explained that the remedies available to the SEC in its in-house proceedings, civil penalties, are "punitive" because the tiered structure of civil penalties "conditions the available penalty on the culpability of the defendant and the need for deterrence, not the size of the harm that must be remedied" and "the SEC is not obligated to return any money to victims" which "by definition does not 'restore the status quo' and can make no pretense of

being equitable." *Id*. at 2130. Because the "Seventh Amendment extends to a particular statutory claim if the claim is 'legal in nature,'" the Court held that the SEC's in-house procedures run afoul of the Seventh Amendment right to a jury trial. *Id*. at 2128.

53.     Where sanctions amount to "penalties," that are "designed to punish and deter, not to compensate," those penalties "are therefore a type of remedy at common law that could only be enforced in courts of law." *Id*. at 2130. Indeed, "'a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment.'" *Id*. (quoting *Austin v. United States*, 509 U.S. 602, 610, 113 S.Ct. 2801, 125 L.E.2d 488 (1993).  Based on the type of penalties and sanctions that are available to the Board in the present case, *see* ¶ 22, *supra*, "this suit implicates the Seventh Amendment right," and decides that an ABD recipient "would be entitled to a jury" as a result of an ultimate Board disciplinary action. *Id*.

54.     The Board's investigation of Plaintiff relates to the audit of cryptoassets.  Despite the explosive growth of the cryptocurrency industry, prior to the audits now under scrutiny in the Board's investigation of Plaintiff, the Board never promulgated any auditing standards expressly governing crypto-related assets and issuers; so, auditors like Plaintiff had no fair notice of regulatory expectations for such audits.  Of the Board's nearly 60 auditing standards, three quality control standards, and 17 Board staff interpretations, at all times relevant to the audits at issue, none expressly addressed or addresses audits of cryptoassets, cryptocurrency, or crypto-mining issuers. Without Board standards or rules providing fair notice, auditors are left only with the option of selecting from a wide range of opinions on the best method of auditing assets of crypto-related issuers.[7]  In fact, in November 2023, one SEC Commissioner criticized the practice of

---

[7] In December 2023, well after the audits at issue, the Financial Accounting Standards Board ("FASB") issued ASU No. 2023-08, "Intangibles—Goodwill and Other—Crypto Assets (Subtopic 350-60): Accounting for and Disclosure

"regulation by enforcement," and focused precisely on the absence of notice in the cryptoassets arena.[8]  Commissioner Mark T. Uyeda, "Remarks to the 2023 Conference on SEC Regulation Outside the United States: Fifth Annual Scott Friestad Memorial Lecture" (Nov. 6, 2023), https://www.sec.gov/news/speech/uyeda-remarks-sec-reg-outside-us-5th-annual-scott-friestad-memorial-lecture. Commenters have likewise recognized the "absence of recognized accounting standards for cryptoassets." *See* Elizabeth Chan, Nicole Tang, Edward Taylor, *Crypto Disputes: The Valuation Challenge*, 17 Disp. Resol. Int'l 21, 39 (2023).

55.     Because there are no formal standards, rules, or regulations articulating any regulatory expectations related to cryptocurrencies, cryptoassets, or crypto-mining issuers, Plaintiff did not have fair notice of the audit expectations underlying DEI Staff's now-expanded substantive investigation through its new ABD and any potential future disciplinary proceedings. And, with the absence of such fair notice, the applicable auditing standards effectively are whatever the Board's DEI Staff claim them to be.

**D.     Plaintiff's "Here-and-Now" Constitutional Injury**

56.     Plaintiff's ongoing nightmare in the Board's enforcement maw is not atypical, with the exception that Plaintiff possesses the rare degree of fortitude and resolve necessary to fight back and challenge the Board.

---

of Crypto Assets." FASB makes clear that "[t]he FASB issues an Accounting Standards Update (ASU) to communicate changes to the FASB Codification, including changes to non-authoritative SEC content. ASUs *are not authoritative* standards." (emphasis added)

[8] "[O]ne of the most discussed areas of the U.S. federal securities laws when someone mentions regulation by enforcement [is] cryptocurrencies and digital assets. For years, market participants have expressed concern about a lack of regulatory guidance in the crypto space. Let's be clear about it—enforcement actions are not well-suited for providing guidance…. Accordingly, the Commission should consider proposing rules or issuing interpretive guidance with respect to cryptocurrencies and digital assets. It's unfortunate that, despite the large number of rule proposals issued by the SEC during the last two years, cryptocurrency was not among them. A responsible regulator considers how the laws and rules apply to new types of securities and then develops or modifies those provisions so that the regulatory requirements can be satisfied….The SEC could have proactively contributed to the creation of a body of law regarding cryptocurrencies and digital assets. Unfortunately, the SEC did not take this approach and instead is pursuing a case-by-case approach through enforcement actions."

57.     Following an informal request in October 2021 with which Plaintiff complied fully, and non-compliance with which likely would have resulted in the Board initiating a formal investigation and DEI issuing ABDs, on August 16, 2022, the Board issued its Order of Formal Investigation. DEI Staff issued to Plaintiff and its personnel six compulsory ABDs (including the ABD of March 14, 2024 challenged by this Complaint) requiring them to produce tens of thousands of pages of documents in an onerous format not even required by the SEC, and to sit for seven full days of formal, on-the-record sworn testimony so far. Yet DEI Staff remains unsatiated; so, it now seeks to expand and prolong its investigation even further. DEI Staff's most recent ABD demands audit documentation and information from an entirely different year's audit than what had consumed the preceding two-and-one-half years of investigation.

58.     When the Board issued its Order of Formal Investigation, the Board set forth a kitchen-sink list of possible violations to investigate without providing Plaintiff any meaningful notice as to the precise issues under investigation. None of the auditing standards or quality control standards cited in the investigation order included the word "crypto," let alone cryptocurrencies, cryptoassets, or crypto-mining. Nevertheless, the investigation, in substance, was entirely about the audit of crypto-mining assets and cryptocurrencies.

59.     Each ABD issued by DEI Staff during its investigation—including the most recent one—has featured similar threats of punishment for "noncooperation":

> Noncooperation with the Board in connection with an investigation may result in the imposition of sanctions as described below. Conduct constituting noncooperation includes (1) failing to comply with an Accounting Board Demand….[I]f a *registered public accounting firm* refuses to testify, produce documents, or otherwise cooperate with the Board in connection with an investigation, the Board may suspend or revoke the registration of the firm, or invoke such lesser sanctions as the Board considers appropriate. Similarly, if a *person associated with* a registered public accounting firm refuses to testify, produce documents, or otherwise cooperate with the Board in connection with an investigation, the Board may suspend or bar such person from being associated with

a registered public accounting firm, or may require the registered public accounting firm to end such association….”

60.    In October 2023, DEI Staff notified Plaintiff's counsel that DEI Staff intended to recommend that the Board initiate a formal disciplinary proceeding that would charge various violations of Board Rules.

61.    In November 2023, Plaintiff's counsel submitted a formal written Statement of Position pursuant to Board Rule 5109(d) that vigorously challenged DEI Staff's proposed charges and disputed the analysis underlying DEI's recommendation.

62.    DEI Staff subsequently informed counsel that DEI Staff -- not the Board but DEI Staff -- was not persuaded by the Statement of Position.  Following several weeks of further discussion, DEI Staff informed counsel, on February 8, 2024, that DEI Staff would proceed with recommending to the Board the initiation of a formal disciplinary proceeding.  DEI Staff further informed counsel that the next notification to counsel would be upon the initiation of the formal disciplinary proceeding. At the time, DEI Staff knew unequivocally that anyone accused in the anticipated proceeding intended to contest vigorously DEI's charges, because the Statement of Position made clear that any enforcement disciplinary proceedings would be litigated.

63.    Over a month later, on March 14, 2024, rather than advising counsel of the initiation of a formal disciplinary proceeding, DEI Staff issued *yet another* ABD compelling Plaintiff to produce *still more* documents within two weeks, under renewed threat of punishment for noncooperation.  This latest ABD would expand DEI's endless investigation to probe an entirely different audit than the previous subject matter of the investigation.

64.    Upon information and belief, DEI Staff issued its latest ABD in the middle of March, with only a two-week compliance deadline, knowing that it would cause severe burden and disruption to Plaintiff during the busiest period of the year for Plaintiff and most other audit

firms and auditors.  Many year-end issuer audits need to be completed by mid- to late March to comply with SEC statutes and regulations, and tax season follows just around the corner in April. At a minimum, DEI staff's strategic timing shows little regard for the Board's professed mission to improve audit quality.

65.     Upon information and belief, DEI Staff issued its latest ABD in retribution and retaliation for refusing to settle on DEI Staff's terms and invoking the right to formal adjudication.

## FIRST CLAIM FOR RELIEF

### (Unlawful Delegation of Legislative Power Without an Intelligible Principle)

66.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

67.     Article I of the Constitution vests all legislative powers in Congress.  Under existing Supreme Court precedent, Congress may delegate legislative power only if it provides the delegatee with an "intelligible principle" to direct the delegatee in exercising those delegated powers.

68.     Sarbanes-Oxley purported to delegate vast legislative power to the Board, including the power to promulgate rules governing virtually every audit of every publicly-traded corporation and broker-dealer with access to U.S. securities markets, and virtually every audit firm and individual participating in those audits.

69.     Sarbanes-Oxley also purported to delegate to the Board the legislative power and mandate to establish, by rule, "fair procedures for the investigation and disciplining of registered public accounting firms and associated persons of such firms."  As previously discussed, however, Congress did not define "fair procedures" and provided the Board with no intelligible principle to direct or constrain the Board in exercising this delegated legislative function.  The Board's

resulting rules for investigating and disciplining registered public accounting firms and their associated persons, including Plaintiff, are therefore constitutionally illegitimate and unenforceable.

70.     By enforcing and continuing to exploit its illegitimate and unenforceable rules, thereby prolonging its investigation of Plaintiff with yet another compulsory ABD and threatening Plaintiff with punishment for "noncooperation" if it fails to comply with the ABD, the Board and its DEI staff are violating, and unless enjoined will continue to violate, Article I of the Constitution, inflicting substantial here-and-now injury against Plaintiff.

### SECOND CLAIM FOR RELIEF

**(Exercise of Private, Unsupervised Executive Power in
Violation of Article II of the Constitution)**

71.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

72.     "A cardinal constitutional principle is that federal power can be wielded only by the federal government.  Private entities may do so only if they are subordinate to an agency." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 872 (5th Cir. 2022) (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Currin v. Wallace*, 306 U.S. 1, 15-16 (1939); and *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)).  "If it were otherwise—if people outside government could wield the government's power—then the government's promised accountability to the people would be an illusion."  *Id*. at 880 (quoting THE FEDERALIST No. 51); *see also Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) ("When it comes to private entities . . . there is not even a fig leaf of constitutional justification" for delegation).

28

73.     The Board's investigation of Plaintiff, including the succession of compulsory ABDs issued by the private citizens employed in the Board's DEI and the anticipated prosecution of Plaintiff in a forthcoming formal disciplinary proceeding, constitute exercises of core governmental executive power under color of federal law.  However, as detailed above, these exercises of core executive power are being performed, and continue to be performed, by private non-governmental actors without any meaningful supervision, oversight, or direction by the SEC or any other governmental agency within the Executive Branch led by principal officers of the U.S. government, much less by the President.  Worse yet, they are being performed, and will continue to be performed, with only minimal, sporadic supervision and direction from the inferior officers whom the SEC appointed to lead the Board.

74.     By exercising core executive law enforcement power against Plaintiff without meaningful direction, oversight, and supervision by principal officers of the Executive Branch, the Board and its DEI staff are violating, and unless enjoined will continue to violate, Article II of the Constitution, inflicting substantial ongoing harm against Plaintiff.

## THIRD CLAIM FOR RELIEF

**(Denial of Due Process of Law in Violation of the Fifth Amendment to the Constitution)**

75.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

76.     Due process of law forbids a person from being compelled to produce personal papers or to provide involuntary testimony in a federal investigation or proceeding unless and until directed to do so by an independent court of law after notice and an opportunity to be heard.

77.     In violation of these requirements, the Board threatens and imposes fines, debarments, and other punishments against those who do not obey Board Staff-issued ABDs,

including the one recently issued to Plaintiff as described herein.  Board Rules provide no guidelines or limits on the number of ABDs the Board's Staff can issue, nor on the cost and burden that those ABDs can impose on their recipients.  Board Rules likewise provide no meaningful process or procedure for recipients of DEI Staff-issued ABDs to obtain Article III judicial review of those ABDs, nor even administrative review by the Board members or the SEC commissioners.  By denying Plaintiff any opportunity to seek or obtain judicial review of the ABD recently issued to it by DEI Staff before subjecting Plaintiff to fines, debarment, other sanctions, and potential criminal prosecution for "noncooperation," the Board is depriving Plaintiff of due process of law in violation of the Fifth Amendment, and will continue to do so unless enjoined.

## FOURTH CLAIM FOR RELIEF

### (Denial of Fair Procedures in Violation of Sarbanes-Oxley § 105(a))

78.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

79.     Sarbanes-Oxley Section 105(a) requires the Board to establish "fair procedures" for its investigative and disciplinary proceedings.

80.     In violation of this requirement, the Board threatens and imposes fines, debarments, and other punishments against those who do not obey Board Staff-issued ABDs, including the one recently issued to Plaintiff as described herein.  Board Rules provide no guidelines or limits on the number of ABDs the Board's Staff can issue, nor on the cost and burden that those ABDs can impose on their recipients.  Board Rules likewise provide no meaningful process or procedure for recipients of DEI Staff-issued ABDs to obtain Article III judicial review of those ABDs, nor even administrative review by the Board members or the SEC commissioners.  By denying Plaintiff any opportunity to seek or obtain judicial review of the ABD recently issued to it by DEI Staff before

subjecting Plaintiff to fines, debarment, other sanctions, and potential referral for criminal prosecution for "noncooperation," the Board is depriving Plaintiff of fair procedures in violation of Sarbanes-Oxley § 105, and will continue to do so unless enjoined.

### FIFTH CLAIM FOR RELIEF

**(Denial of Right to Jury Trial in Violation of the Seventh Amendment to the Constitution)**

81.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

82.     The Seventh Amendment guarantees that in "[s]uits at common law . . . the right of trial by jury shall be preserved…." The Seventh Amendment extends to a particular claim if the claim is legal in nature. Because the claims at issue in this case are legal in nature, the Board may not avoid a jury trial by preventing the case from being heard before an Article III tribunal.

83.     In violation of the Seventh Amendment, the Board threatens and imposes fines, debarments, and other punishments against those who do not obey Board Staff-issued ABDs, including the one recently issued to Plaintiff as described herein. Board Rules provide no guidelines or limits on the number of ABDs the Board's Staff can issue, nor on the cost and burden that those ABDs can impose on their recipients. Board Rules likewise provide no meaningful process or procedure for recipients of staff-issued ABDs to obtain pre-enforcement Article III judicial review of those ABDs, nor even prior review by the Board members or the SEC commissioners.  Moreover, Board Rules do not provide for jury trials or otherwise afford accused parties to invoke their constitutional right to trial by jury. By denying Plaintiff any opportunity to seek or obtain judicial review of the ABD recently issued to it by DEI Staff before subjecting Plaintiff to fines, debarment, other sanctions, and potential referral for criminal prosecution for "noncooperation," and by failing to provide a Rule or mechanism to enable Plaintiff ultimately to

invoke the constitutional right to trial by jury, the Board is depriving Plaintiff of its right to jury trial under the Seventh Amendment, and will continue to do so unless enjoined.

### RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor granting the following relief:

(i)     A declaratory judgment, pursuant to 28 U.S.C. § 2201(a), declaring that the ABD issued to Plaintiff on March 14, 2024 is unconstitutional, unenforceable, void, and quashed;

(ii)    An injunction prohibiting the Board or its staff from (a) enforcing the ABD issued to Plaintiff on March 14, 2024; (b) threatening or imposing punishment or sanctions for "noncooperation" in connection with the ABD; and/or (c) issuing any further ABDs to Plaintiff in connection with its ongoing investigation unless and until it promulgates rules or other protocols disclaiming any power to sanction Plaintiff for failure to comply with the ABD before seeking judicial review and enforcement of the ABD or without a trial by jury;

(iii)   An award of attorneys' fees and costs to Plaintiff; and

(iv)    Such other and further relief as the Court deems just and appropriate.

Dated:  August 9, 2024                           Respectfully submitted,

                                        By:     /s/*John R. Nelson*
                                                John R. Nelson
                                                State Bar No. 00797114
                                                Federal ID No. 32683
                                                DICKINSON WRIGHT PLLC
                                                607 West 3rd Street
                                                Austin, TX 78703
                                                (512) 770-4200
                                                jnelson@dickinsonwright.com

Jacob S. Frenkel (*admitted pro hac vice*)
MD Bar No. 199206092
DICKINSON WRIGHT PLLC
International Square
1825 I St., N.W., Suite 900
Washington, DC 20006
(202) 466-5953
jfrenkel@dickinsonwright.com

Brooks T. Westergard
(admitted *pro hac vice*)
NV Bar No. 14300
DICKINSON WRIGHT PLLC
100 West Liberty Street, Suite 940
Reno, NV 89501
(775) 343-7510
bwestergard@dickinsonwright.com

Russell G. Ryan (*admitted pro hac vice*)
Sheng Li (*admitted pro hac vice*)
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street, N.W., Suite 450
Washington, DC  20036
(202) 869-5210
russ.ryan@ncla.legal

*Counsel for Plaintiff John Doe Corporation*